# EXHIBIT 1

TO DEFENDANT JOHN LOPEZ, M.D.'S MOTION
FOR SUMMARY JUDGMENT PURSUANT TO
FED.R. CIV. P. 56

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Case No. 11-CV-00688

---

VIDEOTAPED REALTIME DEPOSITION OF
JOHN F. SCHULTZ, M.D.,
September 13, 2011

---

TAMAR KELLNER,
Plaintiff,

v.

JOHN F. SCHULTZ, M.D.; JOHN A. LOPEZ, M.D.; and ASPEN VALLEY HOSPITAL DISTRICT d/b/a ASPEN VALLEY HOSPITAL,
Defendants.

---

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 401 Castle Creek Road, Aspen, Colorado 81611 at 9:00 a.m. before Elizabeth Brodlieb, Registered Professional Reporter and Notary Public within Colorado.

**Page 2**

APPEARANCES

For the Plaintiff:
   ISOBEL S. THOMAS, ESQ.
   Leventhal, Brown & Puga, P.C.
   950 South Cherry Street
   Suite 600
   Denver, Colorado 80246

For Defendant Schultz:
   DOUGLAS C. WOLANSKE, ESQ.
   Faraci Wolanske, L.L.C.
   1512 Larimer Street
   Suite 1050
   Denver, Colorado 80202

For Defendant Lopez:
   DAVID J. NOWAK, ESQ.
   White and Steele, P.C.
   600 17th Street
   Suite 600N
   Denver, Colorado 80202-5406

For Defendant Aspen Valley Hospital:
   DONALD E. LAKE, ESQ.
   Lathrop & Gage, LLP
   950 17th Street
   Suite 2400
   Denver, Colorado 80202

Also Present:
   Gary Brodlieb, CCV
   Jenny Helms, COPIC
   Elaine M. Gerson, RN, BSN, MBA, JD, CHC

**Page 3**

INDEX

EXAMINATION OF JOHN F. SCHULTZ, M.D.:    PAGE
September 13, 2011

By Ms. Thomas    5, 333
By Mr. Wolanske    --
By Mr. Nowak    302, 345
By Mr. Lake    --

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 10 | Curriculum Vitae | 10 |
| 11 | Hospital policies | 63 |
| 12 | Telephone bills | 207 |

(Attached to original and copy transcripts.)

REQUESTED PORTIONS OF TESTIMONY:    PAGE

Request for document production    --
Certified question    --
Instruction not to answer    253, 253
Other requests or marked testimony    --

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

| EXHIBIT NUMBER | PAGE |
|---|---|
| 7 | 331 |
| 9 | 291 |

**Page 4**

   WHEREUPON, the within proceedings were taken pursuant to the Rules of Civil Procedure:

   (Deposition Exhibit 10 was marked.)

   THE VIDEOGRAPHER: This is the videotaped deposition of Dr. John Schultz, taken by the plaintiff in the matter of Kellner versus Schultz, held at the Aspen Valley Hospital in Aspen, Colorado, on September 13, 2011, at approximately 9:00 a.m.

   The certified videographer is Gary Brodlieb. The certified court reporter is Beth Brodlieb. We are from Premier Reporting & Video Services. Will all persons present please introduce themselves.

   MS. THOMAS: Isobel Thomas for the plaintiff.

   MR. WOLANSKE: Doug Wolanske on behalf of Dr. Schultz.

   MR. LAKE: Don Lake on behalf of Aspen Valley Hospital.

   MR. NOWAK: Dave Nowak representing Dr. Lopez.

   MS. GERSON: Elaine Gerson, representative of Aspen Valley Hospital.

   MS. HELMS: Jenny Helms, Copic

                                                                25
```
 1    Q    Fair enough.
 2    A    -- specifically.
 3    Q    Doctor, back in March of 2009, who
 4  were you employed by?
 5    A    I'm sorry. Say again.
 6    Q    Sure. In March of 2009, who was your
 7  employer?
 8    A    I'm self-employed.
 9    Q    And that was true in March of '09?
10    A    Correct.
11    Q    You're board certified in surgery?
12    A    Correct.
13    Q    You passed that on first try?
14    A    I passed the written exam on my second
15  try. I passed the oral exam on my first attempt.
16    Q    And is that good for 10-years-or-so
17  from the time of passing?
18    A    Yes.
19    Q    And I presume, when that 10 years is
20  up, you plan to recertify?
21    A    I have already done the
22  recertification and passed it on my first attempt.
23    Q    And the recertification exam is a
24  little bit different than the original exam, true?
25    A    It's a written exam.
```

                                                                26
```
 1    Q    No oral?
 2    A    There's no oral for the
 3  recertification.
 4    Q    Doctor, in your role as a trauma
 5  surgeon and being on the committees you've been on
 6  here in Aspen, do you have any role in working with
 7  the State Department of Public Health?
 8    A    I do not.
 9    Q    For example, I assume, even though you
10  don't have -- haven't done that, you understand
11  that the State Department of Public Health comes in
12  and assesses various levels of hospitals from time
13  to time?
14         MR. WOLANSKE: Form, foundation.
15    A    I'm sorry. Did you say the --
16    Q    (By Ms. Thomas) State Department of
17  Public Health.
18    A    Yes. I'm not sure what -- exactly
19  what they do or what they review.
20    Q    Okay. But you've had nothing to do
21  with that?
22    A    Correct.
23    Q    Doctor, back in March of 2009, Aspen
24  was a level what hospital or trauma center?
25    A    I'm sorry. You said Dr. Beck again.
```

                                                                27
```
 1         MR. WOLANSKE: No. She said "back."
 2         THE DEPONENT: Oh, Doctor, back.
 3         MR. WOLANSKE: I'm hearing "Beck" as
 4  well.
 5         MS. THOMAS: Just my funny accent. I
 6  know you're Dr. Schultz.
 7         THE DEPONENT: There's a physician on
 8  staff Dr. Beck.
 9    Q    (By Ms. Thomas) Right. I saw his name
10  in the record, so I know you're Dr. Schultz. But
11  back in 2009, what level trauma center was Aspen
12  Valley, to your knowledge?
13    A    Level III.
14    Q    And it's still level III?
15    A    Correct.
16    Q    From your standpoint as someone who
17  has been chief of surgery and one of the two trauma
18  surgeons here at Aspen Valley, what services does
19  Aspen Valley offer or not offer for patients since
20  it's a level III?
21         MR. WOLANSKE: Object to form.
22    A    I'm sorry. Say again.
23    Q    (By Ms. Thomas) Let me ask it -- I'll
24  ask you a better question. Am I right, in March of
25  2009, there was no neurosurgeon here?
```

                                                                28
```
 1    A    I don't believe we had any
 2  neurosurgeon on active privileges.
 3    Q    And if they didn't have active
 4  privileges, it means they could not operate here,
 5  true?
 6    A    Correct.
 7    Q    Did you have some neurosurgeon or
 8  neurosurgeons on inactive or less-than-active
 9  privileges?
10    A    At one point, Dr. Miller had
11  consulting privileges, I believe, but I don't know
12  what his status was at that time.
13    Q    And what's your understanding of what
14  his consulting privileges were?
15         MR. WOLANSKE: Foundation.
16    A    I don't know exactly.
17         MR. WOLANSKE: Don't guess if you
18  don't know, but you can answer if you know
19  generally.
20    A    He could provide consultation
21  regarding care.
22    Q    (By Ms. Thomas) Dr. Miller was in
23  Glenwood Springs; is that right?
24    A    You say "was."
25    Q    Was.
```

```
                                                    109
 1  like five miles.
 2     Q     Doctor, in the past, when you have
 3  managed patients on anticoagulation with brain
 4  bleeds, have you had opportunity in the past to
 5  reverse or stop that anticoagulation?
 6     A     Probably. I can't recall a
 7  specific -- I can't recall a case.
 8     Q     Do you understand, from your
 9  standpoint as a trauma surgeon, why, if you -- why
10  it's important to reverse or stop a patient's
11  anticoagulation if they present with a bleed?
12     A     Yes.
13     Q     Tell me why.
14     A     So that they won't bleed further.
15     Q     Do you have an independent
16  recollection of your care and treatment of Tamar
17  Kellner other than what's in the record?
18     A     I'm not sure what you mean by that.
19     Q     Sure. You've looked at your records
20  and the records for Tamar Kellner from Aspen Valley
21  in preparation for today's deposition, true?
22     A     Yes.
23     Q     Are you relying solely on what's in
24  the record or do you actually have memory of being
25  involved in her care and treatment back in March of
```

```
                                                    110
 1  '09, separate from what's in the record?
 2     A     I'm sure there's some things that are
 3  separate. I don't have -- I didn't bring a list
 4  with me.
 5     Q     Sure. And I'm not --
 6     A     I know when I reviewed it, there was
 7  some issues that I recalled differently.
 8     Q     So when you reviewed the records,
 9  there were some issues in your head that you
10  recalled differently than what may be in the chart?
11     A     Yes.
12     Q     We're going to go through the chart,
13  but since you probably just looked at it in
14  preparation for today, do you recall or can you
15  tell me, in general, what those issues are that you
16  recall differently from what's in the chart?
17     A     Yeah. I mean, I probably couldn't
18  give you a comprehensive list without going through
19  the chart section by section.
20     Q     For example, do you remember what
21  Tamar Kellner looked like?
22     A     I don't think I could describe her.
23     Q     Could you describe her husband?
24     A     Yes.
25     Q     What does he look like?
```

```
                                                    111
 1     A     As I recall, he was sort of tall,
 2  generally thin, athletic build, brown hair. I
 3  remember him wearing a white turtleneck sweater in
 4  the ICU.
 5     Q     How is it that you, yourself, came to
 6  be involved in the care and treatment of Tamar
 7  Kellner?
 8     A     I was requested to see her by the
 9  emergency room physician.
10     Q     And is that Dr. Bernard?
11     A     I know that Dr. Bernard is the ER
12  physician. I can't recall who called me.
13     Q     Someone called you, and you were the
14  trauma surgeon on call; is that fair?
15     A     Correct.
16     Q     And do you know if, at the time you
17  were called, she was already in the ER or if she
18  was en route? Do you know anything about that,
19  whether from your own recollection or from the
20  chart?
21     A     I recall that I was notified and I
22  think had some discussion with them that the
23  ambulance was transporting her, that they were
24  going to evaluate her and then they would call me
25  back when they had more information.
```

```
                                                    112
 1     Q     Do you know where you were when you
 2  received the call or page?
 3     A     I don't recall.
 4     Q     Do you know if calls for trauma in or
 5  out of the ER are recorded?
 6     A     I don't think they are. Do you mean
 7  the ER physicians' line?
 8     Q     Any line in the ER.
 9     A     To my knowledge, the hospital phones
10  are not recorded. I don't know about ambulance
11  radio calls.
12     Q     If we look at the chart, and there's a
13  patient registration record, and I think it's the
14  first page of -- I think, hopefully at least --
15  like I said, even though some of these are numbered
16  and some are not, I'll try to go as much in order
17  as we can.
18           There's some writing on the bottom of
19  this registration record, 1458 and 1750. Do you
20  see where I am?
21     A     Yes.
22     Q     Is that your writing?
23     A     Which one?
24     Q     Well, either, 1458 or 1750.
25     A     The 1750 looks like my writing.
```

## Page 129

1 talking about just that single page?
2    MS. THOMAS: Yeah. We're just going
3 page by page.
4    Q   (By Ms. Thomas) If you go to the next
5 page of the emergency physician record, it's AVH
6 Bates stamp 2. Does your writing appear anywhere
7 on this document?
8    A   No.
9    Q   Is it fair to say that the CT of the
10 brain was ordered by someone else other than
11 yourself?
12    A   Yes.
13    Q   And at least at the time she was in
14 the -- at least at the time this document was
15 created, her INR was noted to be 2.8, true? Bottom
16 left-hand corner.
17    A   Yes, it does say that here.
18    Q   And it looks like on the right-hand
19 column under progress, there was a note of the CT
20 scan, 1527 read by Radiologist Dr. Chapman. Do you
21 know Dr. Chapman?
22    A   No.
23    Q   Am I correct that your CT scans are
24 read electronically outside of Aspen?
25    MR. WOLANSKE: Foundation.

## Page 130

1    A   They are sometimes.
2    Q   (By Ms. Thomas) And is it 15 -- and
3 again, I know it's not your writing, but it looks
4 like, under progress, 1517, it was discussion with
5 Dr. Schultz. Do you see where I'm at?
6    A   Yes.
7    Q   Okay. Is it fair to say you believe
8 your contact or your first connection with this
9 case was somewhere around 1517 in the afternoon?
10    A   Probably.
11    Q   And underneath it, it says: Attempted
12 to contact Dr. Miller/Weitz, not available. Do you
13 believe that to be Dr. Miller, the neurosurgeon, we
14 talked about earlier today?
15    MR. WOLANSKE: Foundation.
16    A   Again, these aren't my notes.
17    Q   (By Ms. Thomas) I understand.
18    A   So...
19    Q   I understand, but you were involved in
20 the care and treatment, and if you don't know,
21 that's fine, but do you know where it's documented
22 Dr. Miller/Weitz who this physician's referring to?
23    A   Well, I mean, I would guess it's
24 Dr. David Miller. I have no idea who Weitz is.
25    Q   But that's not something -- well,

## Page 131

1 strike that.
2    Do you know, because it comes after
3 discussion with Dr. Schultz, do you know, in this
4 initial contact you had with whomever wrote this,
5 who I think might have been Dr. Bernard, what you
6 were told at 1517?
7    A   I have a general recollection.
8    Q   Okay. Tell me what it is.
9    A   That there was a patient who had
10 suffered a ski fall, had reported loss of
11 consciousness, and they had had a CT scan, and the
12 ER doctor thought they might have intracranial
13 hemorrhage, and that they were evaluating the
14 patient and would contact me further.
15    Q   In terms of that conversation, did you
16 give that person any advice or recommendations as
17 to what to do or just you were going to wait until
18 they contacted you further?
19    A   I don't believe I was actually
20 consulted at that time. I was -- it was a
21 notification.
22    Q   Well, did you have an actual
23 conversation with another medical provider at 1517?
24    A   Yes.
25    Q   But you don't believe that was a

## Page 132

1 consultation, it was just that you were notified?
2    A   It was not a consultation.
3    Q   And you were not requested to come in?
4    A   No.
5    Q   I want to ask you, so 1546, it says --
6 it looks like it says CT pushed to St. Mary. Will
7 discuss -- I think that says with neurosurgery.
8 Had you had opportunity in the past to transmit
9 films to the neurosurgeons at St. Mary's?
10    A   Yes. I don't actually transmit them,
11 but...
12    Q   I assume you don't personally do it,
13 but you've got that capability here at Aspen, where
14 you can tell someone I want you to transmit this
15 over?
16    A   Yes.
17    Q   And then underneath that, it looks
18 like -- I think it might be 1600. It's probably
19 clearer. We can look on the break on the original.
20 I think it talks about the INR being --
21    MS. THOMAS: If you see it, Doug, let
22 me know if it's 1600.
23    Q   (By Ms. Thomas) -- 2.8, and then it
24 says something about calling Dr. Lopez. Do you
25 know if at this point, if it's 1600, you were in

**133**

1  the ED?
2  A    I don't know.
3  Q    Are you aware of anyone else other
4  than yourself speaking with Dr. Lopez on March 20,
5  2009, regarding Tamar Kellner?
6  A    I don't know.
7  Q    And at least the physician's clinical
8  impression was intracranial pressure and
9  subarachnoid, is that right, amongst other things?
10      MR. WOLANSKE: Object to form.
11 A    I believe that's what it says here.
12 Q    (By Ms. Thomas) It says the disposition
13 was admitted. When, in the course of events, did
14 you arrive in the ED?
15 A    Well, I didn't record the time myself.
16 Q    Okay. Is there anything in the record
17 that would reflect what time you did arrive in the
18 ED?
19 A    It's documented here that, on page
20 marked AVH 4, right-hand column under the two block
21 sections, section marked additional notes, that at
22 1645 I was at the bedside.
23 Q    Okay. But as to other than what's
24 documented in the chart at 1645, you can't -- you
25 don't have any other recollection as to when you

**134**

1  actually arrived in the ED, true?
2  A    I don't have any documentation. I
3  wouldn't have marked or recorded it for any reason.
4  Q    Okay. And so it was sometime between
5  1645 and 1750 or 1753 you believe you spoke to Dr.
6  Lopez and Dr. Kelleman at least, true?
7  A    Yes.
8  Q    And Dr. Locke you may have talked to
9  in that time frame, but it may have been also after
10 you dictated your history and physical, true?
11 A    Correct. I think -- go ahead.
12 Q    You think what? Tell me -- first of
13 all, do you have an independent recollection of
14 seeing Tamar Kellner in the ED?
15 A    Yes.
16 Q    And how did she appear when you saw
17 her?
18 A    In regard to?
19 Q    Her general appearance. I mean, was
20 she alert, was she oriented, was she in pain? What
21 do you recall about her?
22 A    She was alert, oriented, no distress.
23 I can't remember what she was wearing. I can't
24 remember if she was clothed or in a gown.
25 Q    And did you examine her?

**135**

1  A    Yes.
2  Q    Did you have any other patients at
3  this time or was she your only patient?
4  A    In the emergency room?
5  Q    Um-hum.
6  A    I don't believe I had any other
7  patients in the emergency room at that time.
8  Q    Now, at the time you came -- actually,
9  let me back up for one second because you said you
10 did get that call somewhere around 1517 and you
11 were awaiting further information or something to
12 that effect, true?
13 A    Yes.
14 Q    Did you get another call at some point
15 where your presence was requested or how did that
16 happen?
17 A    That's my recollection, yes.
18 Q    And do you know who made that call?
19 A    No.
20 Q    And what -- do you recall anything
21 about what transpired in that call?
22 A    No.
23 Q    But is it a fair assumption your
24 presence was requested because you showed up
25 sometime thereafter?

**136**

1  A    Yes.
2  Q    And at the time you saw Tamar Kellner
3  and examined her, did you take over her care from
4  the ED physician at that point?
5  A    I wouldn't say I necessarily took over
6  her care.
7  Q    What would you say?
8  A    That I was evaluating her.
9  Q    Well, assumedly, the ED physician
10 requested you evaluate her as a trauma surgeon,
11 true?
12 A    Yes.
13 Q    Do you remember -- I know you said you
14 could describe her husband, but do you remember
15 seeing her husband at all, whether it was -- I
16 think he's testified that for a period of time she
17 was in back being evaluated and he was in the
18 front. Do you recall seeing him at all in the ED,
19 whether it was in back or in front?
20 A    I very clearly remember seeing him in
21 the emergency department, but I don't know what
22 he's referring to about back and front.
23 Q    How long did you spend with Tamar
24 Kellner while she was in the ED?
25 A    Oh, it was probably an hour to an hour

141

1   Q    And you asked for a neurosurgical
2  consultation because you recognized that you and
3  Aspen Valley Hospital had not had the capability to
4  care for her in the event she needed neurosurgery,
5  true?
6   A    Yes.
7   Q    And you recognize that Dr. Lopez, who
8  ended up being the person on the phone, had more
9  expertise than you did in neurosurgery?
10  A    Yes.
11  Q    And did you rely on what Dr. Lopez
12 told you?
13  A    Yes.
14  Q    Okay. To the best of your ability --
15 I know we can kind of put aside the anticoagulation
16 part of the discussion, unless you think of
17 anything else that you talked about with Dr. Lopez
18 regarding that. Tell me to the best of your
19 recollection what you and Dr. Lopez talked about
20 other than stopping or reversing the
21 anticoagulation.
22  A    So you're asking me what else we
23 talked about other than the anticoagulation?
24  Q    Correct.
25  A    I told him who I was, that I was a

142

1  trauma surgeon here at Aspen Valley Hospital, that
2  we had a patient in the emergency room, and I
3  described her general, you know, age, gender, some
4  of her medical conditions, that she was out skiing
5  earlier in the day and had a fall, we weren't sure
6  of the nature of her fall, that she presumably had
7  hit her head, had a reported loss of consciousness,
8  was transported by ambulance to the emergency
9  department, that she was in our emergency
10 department at that time.
11      I gave him a synopsis of my
12 examination and evaluation of her including that
13 she was awake and oriented at that time, that she
14 had a GCS of 15, that she had already had a CT scan
15 of the head and brain performed, which, by my
16 interpretation and the radiologist's
17 interpretation, indicated that she had bilateral
18 subarachnoid hemorrhage. I'm trying to remember
19 what other background information I gave him. I
20 think that's the majority of it.
21  Q    Okay.
22  A    And then we discussed her particular
23 condition and case. He had the opportunity to --
24 he indicated to me that he had reviewed her films.
25 He indicated that he didn't feel like she needed

143

1  neurosurgical care at this point. We discussed the
2  possibility of transferring her to St. Mary's to be
3  under his care.
4       He said he didn't feel it was
5  necessary at this time and point, but that he would
6  be willing to accept her in transfer. He said that
7  if she didn't want to be transferred, that he felt
8  it would be suitable and appropriate for her to be
9  admitted to Aspen Valley Hospital in the intensive
10 care unit and have monitoring, meaning clinical
11 monitoring.
12  Q    Okay. Anything else that you recall
13 during this conversation with Dr. Lopez?
14  A    I can't recall specifically right now.
15  Q    Okay. And I understand you don't
16 recall specifically. Anything else you recall
17 generally as we sit here or is that the extent of
18 it?
19  A    That seems to be the extent of it.
20  Q    Okay. Do you know how long this call
21 or do you have an estimate of how long this phone
22 call took?
23  A    No, I do not.
24  Q    I took Dr. Lopez's deposition last
25 week, and he told me his recollection of the phone

144

1  call, and he said he thought it took two to three
2  minutes. Does that sound correct or --
3   A    No.
4   Q    -- do you think it was longer?
5   A    I think it was longer.
6   Q    Can you estimate for me how much
7  longer than two to three minutes?
8   A    It's probably five-to-ten-minute
9  range. I would say it was at least five minutes.
10  Q    He also told me at the time the phone
11 call occurred he was in a spinal surgery. Was that
12 anything you were aware of at the time you had this
13 consultation with Dr. Lopez?
14  A    No.
15  Q    He did tell me, while he was in the
16 spinal surgery, he was able to see the film of
17 Mrs. Kellner's head. Was that something on your
18 end you were looking at with him when you were
19 discussing the film?
20  A    I can't recall.
21  Q    His notes document, I think in more
22 than one place, that he saw a small subdural on
23 this film. Did he ever tell you he saw a small
24 subdural?
25  A    No.

Page 161

```
 1    A    Yes, I believe I mentioned that.
 2    Q    But, certainly, the people with more
 3  expert -- well, first of all, you were here at the
 4  bedside with the patient, true?
 5    A    Correct.
 6    Q    And Dr. Lopez you were consulting
 7  because you understood him to have more expertise
 8  in managing brain bleeds than you did, true?
 9    A    Correct.
10    Q    And you had no idea what
11  Dr. Kelleman's expertise was in managing a brain
12  bleed from a trauma surgeon or a neurosurgical
13  perspective, true?
14    A    Correct.
15    Q    Are you critical of Dr. Kelleman?
16    A    Critical in what way?
17    Q    In any way.
18    A    I mean, he seemed very nice and
19  pleasant. He seemed like he was trying to be
20  helpful. I don't remember having an impression at
21  the time --
22    Q    Okay.
23    A    -- otherwise.
24    Q    Okay. And I just want to ask because
25  this is, again, my only opportunity to talk to you
```

Page 162

```
 1  before trial, and I don't want to be surprised when
 2  we go to trial. You're not going to come in at
 3  trial and say I'm critical of Dr. Kelleman because
 4  for this reason or that reason, true?
 5    A    Well, I mean, at the time, I wasn't --
 6  I didn't think anything particular of the
 7  conversation.
 8    Q    Okay.
 9    A    I don't know. I hadn't really thought
10  about it yet in retrospect. So at this point I
11  don't really have an opinion.
12    Q    Okay. So you are not going to tell
13  the jury in this case that you're critical of
14  Dr. Kelleman for anything; is that correct?
15         MR. WOLANSKE: Form, foundation, asked
16  and answered.
17    A    Yeah, at this point, I guess I don't
18  really have an opinion on it.
19    Q    (By Ms. Thomas) Okay. And there's no
20  additional information you would need between now
21  and the time of trial. You know what your
22  involvement was with Dr. Kelleman, you know what
23  your involvement was with Mrs. Kellner. There's no
24  additional information that you don't have access
25  to regarding your conversation with Dr. Kelleman,
```

Page 163

```
 1  true?
 2    A    Well, I mean, certainly if
 3  Dr. Kelleman later says I told him to do this, I
 4  told him to do that, and I'm an expert in this, and
 5  I'm an expert that, and he didn't speak up at the
 6  time, yes, I'd be highly critical of him.
 7    Q    Fair enough, Doctor. And, certainly,
 8  you understand that Dr. Kelleman may have his own
 9  recollection of the phone call?
10    A    Certainly.
11    Q    And you don't know what Dr. Kelleman's
12  custom and habit is when he is consulted regarding
13  whether it's safe to stop or reverse
14  anticoagulation when he's consulted for various
15  patients, true?
16    A    I don't know his customary practice.
17    Q    Okay. I want to jump back, Doctor,
18  because we kind of segued off to Dr. Kelleman, and
19  we were talking about the multifactorial reasons or
20  reason you decided to keep her here. Now, you said
21  you were evaluating the information you had at the
22  time and you thought the best route for her care
23  was to stay here. Did I understand you correctly?
24    A    I didn't say it was that I decided it
25  was necessarily best. I said that it was safe and
```

Page 164

```
 1  we were able to provide the capability.
 2    Q    You could provide the monitoring
 3  capability?
 4    A    Correct.
 5    Q    But you couldn't provide any surgical
 6  intervention, if it was needed, true?
 7    A    Correct.
 8    Q    You said one of the reasons or one of
 9  the factors was that her -- she was neurologically
10  stable, true?
11    A    Correct.
12    Q    You also recognize that someone with a
13  brain bleed on Coumadin may in fact become unstable
14  neurologically, true?
15    A    Correct.
16    Q    I think what you said is she -- her
17  subarachnoid after her fall -- I apologize. I
18  can't read my writing. You said it was several
19  hours after her fall. What significance is it that
20  it was several hours after her fall from your
21  standpoint in terms of it being a factor to keep
22  her here at Aspen Valley?
23    A    That she was doing so well clinically.
24  Here she was alert, oriented, conversant,
25  appropriate, and asking to go home.
```

**Page 177**

1 hemorrhage, coagulopathy.
2 Q And your plan was what?
3 A Discussed with neurosurgery and
4 patient's cardiologist, reversing anticoagulation,
5 medicine consult, admit ICU, head CT in a.m.
6 Q Okay. So is it fair, looking at this
7 note, you'd probably already talked with Dr. Lopez
8 and Dr. Kelleman as of 1730?
9 A Yes.
10 Q Probably unlikely, based on this note,
11 that you had talked to Dr. Locke as of yet; is that
12 fair?
13 A Correct.
14 Q And why were you admitting to the ICU
15 rather than somewhere else?
16 A We have two options, the intensive
17 care unit and the patient care unit. The intensive
18 care unit, they can do one-on-one nursing and
19 hourly examination of the patient, vital signs,
20 neuro checks.
21 Q Is it fair that you wanted her to have
22 close monitoring, which is why you put her in the
23 ICU?
24 A That's correct.
25 Q And you wanted close monitoring

**Page 178**

1 because you wanted to make sure, if there was a
2 change in her condition, that it would be known
3 immediately?
4 A Correct.
5 Q And is that because you recognized
6 that, if there was a change in her condition, she
7 might need immediate neurosurgical intervention?
8     MR. WOLANSKE: Form.
9 A We wanted her monitored closely to
10 determine if there's any deterioration.
11 Q (By Ms. Thomas) Sure. And if there was
12 deterioration, she might need immediate
13 neurosurgical intervention, true?
14 A Well, there's a whole spectrum.
15 Q Sure. And that's one of the things on
16 the spectrum?
17 A Yes, certainly.
18 Q Why did you -- why was your plan to
19 have a head CT in the morning?
20 A That's a routine measure.
21 Q Well, is it a routine measure to see
22 if there has been an increase in the bleeding?
23 A It's typically more to check for
24 resolution, but yes, also to see if there's any
25 progression.

**Page 179**

1 Q So even though you felt she required
2 one-on-one nursing so she could be carefully
3 monitored and she required a follow-up CT to see if
4 there was resolution or progression of her brain
5 bleed, you still recommended to the family, based
6 on your conversation and consultation with
7 Dr. Lopez, that it was okay to keep her here at
8 Aspen Valley; is that correct?
9     MR. WOLANSKE: Form.
10 A It wasn't my recommendation.
11 Q (By Ms. Thomas) Well, you told the
12 family you had talked to Dr. Lopez, and that you
13 had discussed it was okay to keep her here at
14 Aspen?
15 A I told them that Dr. Lopez said that
16 he felt it was safe for her to be at our facility.
17 It's appropriate.
18 Q But you, obviously, felt it was safe
19 for her to be here as well or you would have
20 ordered her transferred, true?
21 A I would have recommended -- if I felt
22 it was unsafe for her to be here, I would have
23 recommended for her to be transferred, and if the
24 family refused, that would be a separate issue. I
25 can't order them to do it. I can recommend that

**Page 180**

1 they do it.
2 Q Sure. But they didn't refuse in this
3 case.
4 A They declined.
5 Q After talking with you where you told
6 them about the conversation with Dr. Lopez.
7 A Yes.
8 Q And is it anywhere in your chart or
9 documentation, Doctor, that you discussed the risks
10 to Tamar Kellner of staying here where there was,
11 in fact, no neurosurgeon?
12 A It is not documented in my
13 documentation.
14 Q Certainly, Doctor, if they did refuse
15 transfer, that should be documented, true?
16 A Certainly.
17 Q But again, you're not critical of them
18 because you -- strike that.
19     You're not critical of them for
20 listening to what you said and choosing to stay
21 here based on your conversation, true?
22     MR. WOLANSKE: Form.
23 A I don't think critical would be the --
24 I wouldn't describe it as being critical of them,
25 no.

253

1 MR. LAKE: Hold on.
2 MS. THOMAS: I'm just asking if it got
3 reviewed. I'm not asking --
4 MR. LAKE: I understand, but whether
5 or not it was reviewed is subject to the privilege.
6 MS. THOMAS: I disagree.
7 Q (By Ms. Thomas) Did you attend any M
8 and M meetings regarding this case?
9 MR. WOLANSKE: I'm going to again -- I
10 think it's the same thing. It's quality assurance
11 meetings. If he did or did not attend one I think
12 is privileged.
13 Q (By Ms. Thomas) Are you aware of any
14 meetings being held regarding this case?
15 MR. WOLANSKE: Same objection. I'm
16 going to instruct him not to answer.
17 Q (By Ms. Thomas) Did you ever fill out
18 an incident or occurrence report regarding this
19 case?
20 MR. WOLANSKE: Same objection,
21 instruct him not to answer.
22 Q (By Ms. Thomas) Who sits on the trauma
23 QI or QA committee?
24 MR. WOLANSKE: Foundation.
25 A Currently, or at this time?

254

1 Q (By Ms. Thomas) At this time.
2 A I don't know.
3 Q Are you -- well, strike that.
4 Are you aware, as a result of the care
5 and treatment rendered Tamar Kellner and
6 specifically the decision to keep her at this
7 hospital, if any policies, protocols, anything like
8 that were changed?
9 A Specifically because of this case, no.
10 Q What about generally because of this
11 case?
12 A Again, no.
13 Q Okay. I want to go back to the
14 nurse's notes, Doctor. And if you go to page 5 of
15 5, this is at it looks like 1:25 in the morning.
16 At the top left-hand -- it says 1:06 then 1:25
17 under it. Do you see where I am?
18 A Yes.
19 Q And at this point, Cindy documents:
20 "Patient more somnolent now, withdrawing to painful
21 stimuli, no verbal response. Dr. Schultz paged.
22 Order obtained for stat head CT," true?
23 A Correct.
24 Q And the calls on your record looks
25 like the intensive care was at 1:47 a.m., and

255

1 there's an emergency room call at 1:48. I
2 assume -- well, first of all, did the emergency
3 room call have anything to do with Tamar Kellner?
4 A Yes.
5 Q What was that?
6 A There's this call from 1:30 on the
7 land line.
8 Q I'm sorry. I was just looking at the
9 cell phone. This is the home number, the 1:30?
10 A Yes. That's my land line, that 1:30
11 call from 923-9515 to 544-2080.
12 Q Okay. And is it fair to say that's
13 probably when you ordered the stat head CT?
14 MR. WOLANSKE: Form.
15 A Possibly.
16 Q (By Ms. Thomas) And then there's --
17 A Again, I can't -- I've tried to
18 identify that number, and it doesn't match a known
19 extension, but some of the phones here in the
20 hospital come up as the extension numbers get
21 mismatched.
22 Q Okay. If we look at your cell phone
23 bill, Doctor, there's some activity starting at --
24 you can get there. Just let me know when you're
25 there.

256

1 A I'm looking at the -- this page.
2 Q Okay. There's a call at 1:51 to Grand
3 Junction, St. Mary's Hospital. Do you know who you
4 spoke or called to or from? Do you know who you
5 spoke to there?
6 A It was probably Dr. Hilty at that
7 time.
8 Q Okay.
9 A The 1:47 -- well, go ahead.
10 Q Well, let's just run through the
11 calls. The 1:47 call is the intensive care unit.
12 Do you know who that was with?
13 A Cindy.
14 Q And do you recall anything about that
15 conversation?
16 A I do recall specifically that prior to
17 the call I was -- it was in response to a page.
18 She was paging me to tell me the CT was done. I
19 was already viewing it at home and I was already
20 out of bed getting ready to come into the hospital,
21 and told her, you know, I've got the scan pulled
22 up, looks like, you know, she's got a bleed at this
23 point and a new subdural hematoma, and we're going
24 to have to transfer her. So I told her I wanted
25 her to start preparing for that process.

257

```
 1    Q    You recognized it was a large bleed,
 2  true?
 3    A    I recognized that she had a new large
 4  subdural hematoma.
 5    Q    And when that new large subdural
 6  hematoma developed you cannot say, true?
 7    A    Correct.
 8    Q    But -- well, strike that.
 9         There's another call 1:48, which looks
10  like it's the emergency room at AVH, and I'm sorry
11  if you told me this. What was that call?
12    A    I suspected -- so at this point I was
13  already en route to the hospital, and so I was
14  trying to make arrangements for the transfer, get
15  as much done while I could en route. So I had
16  called the emergency room and to get contact
17  information for St. Mary's Hospital. I didn't have
18  the number programmed into my phone, and I think
19  that was also the point I asked them to page
20  Dr. Beck, the anesthesiologist.
21    Q    And that was to intubate Tamar?
22    A    To be there and assist, if needed.
23    Q    I saw in the notes you had
24  difficulties intubating her; is that right?
25         MR. WOLANSKE: Form.
```

258

```
 1    A    I don't recall. I'd have to review,
 2  look at the note.
 3    Q    (By Ms. Thomas) Okay. We'll go through
 4  that.
 5    A    Do you mean me?
 6    Q    Well, did you make attempts to
 7  intubate yourself?
 8    A    I don't think I did.
 9    Q    Okay. But you called Dr. Beck because
10  you anticipated that you might need to intubate her
11  or have her intubated; is that fair?
12    A    Yes.
13    Q    Okay. At 1:53, there's a call with
14  the house supervisor. Is that Bill?
15    A    It would have been, yes.
16    Q    And do you recall anything about that
17  phone call?
18    A    I don't recall the specifics, but I
19  imagine I was calling him to say, hey, we're
20  transferring this patient to St. Mary's, get the
21  transport crew ready.
22    Q    Okay. 1:55, there's a call with
23  Dr. Locke. Do you remember anything about that
24  call?
25    A    I was only calling him to inform, give
```

259

```
 1  him an update on the situation.
 2    Q    Just jumping over to -- strike that.
 3  Actually, I do. I want to jump -- there's another
 4  phone call on your actual cell phone bill at 1:55
 5  to Glenwood Springs. Do you know what that call
 6  is? Is that Dr. Locke? Might be. Yeah, looks
 7  like it's Dr. Locke from comparing the numbers.
 8    A    Phone number, 948-3106?
 9    Q    Right.
10    A    Yes, that's Dr. Locke's cell phone
11  number. I had it in my phone for some reason.
12    Q    Is it correct that all the calls
13  between 1:55 -- there's a two-minute and some one
14  minutes between 1:55 and 2:07 were while you were
15  on the way to the hospital to help expedite
16  transfer?
17    A    I believe so.
18    Q    There is a 6:17 call in the morning on
19  your cell phone bill. It says Grand Junction. Do
20  you know who you spoke to over there?
21    A    No, I do not.
22    Q    There's another call for the 21st at
23  9:13 in the morning. Do you know who you spoke to
24  over there?
25    A    I do recall a phone conversation at
```

260

```
 1  some point in the morning and did speak with -- I
 2  think it was one of the nurses in the ICU to check
 3  on Mrs. Kellner's status. I suspect that the 6:17
 4  call, they weren't able to provide me any
 5  significant update at that time, but I do remember
 6  the bulk of the conversation when I finally did
 7  reach someone. I think it was -- let me look at
 8  the duration here.
 9         Yeah. So the 6:17 call was one
10  minute, the 9:13 call was five minutes. I presume
11  from that the 9:13 call was when they actually gave
12  me some information.
13    Q    Did you ever speak to the Kellners,
14  anyone in the family, Mr. Kellner, any of his
15  family members, prior to the transfer?
16    A    Yes.
17    Q    Okay. Do you know where that is
18  documented on your bills, if at all?
19         MR. WOLANSKE: Form.
20    A    I spoke to him in person in the
21  intensive care unit.
22    Q    (By Ms. Thomas) There were no phone
23  calls; is that right?
24    A    I did not call him.
25    Q    Someone, obviously, called him to come
```

277

1  Q  She was noted, I think, on arrival to
2  be comatose with blown pupils. Was that your --
3  I'm talking about arrival at St. Mary's, but was
4  that the condition of her the last time you saw
5  her?
6      MR. WOLANSKE: Form.
7  A  I don't recall. With the medications,
8  that she had at the time, I don't think we would
9  have been able to assess that either, given that
10 she'd had paralytics.
11 Q  (By Ms. Thomas) And as to whether or
12 not she was in the process of herniating her brain
13 at the time she arrived at St. Mary's you would
14 defer to Dr. Lopez, the neurosurgeon?
15 A  I don't think I could make that
16 determination she was herniating upon arrival.
17 Q  Obviously, once a transfer is ordered,
18 there is a period of time in which that transfer
19 has to be effectuated both in paperwork and things
20 like that, that you've told me about here in this
21 hospital, true?
22 A  Yes.
23 Q  And I think in this particular case,
24 the helicopter was sent from St. Mary's over here
25 and then it returned to St. Mary's, true?

278

1  A  I don't recall specifically where it
2  originated from, if it was on the pad at St. Mary's
3  or elsewhere.
4  Q  Okay. I think there's documentation
5  that she left here somewhere around 3:45 a.m. Is
6  that your understanding?
7      MR. WOLANSKE: Form.
8  A  I'd have to refer to --
9  Q  (By Ms. Thomas) Okay. Go ahead.
10 A  Is there a specific place you're
11 looking at?
12 Q  I think --
13 A  Maybe the nurse's notes?
14 Q  There's a patient transfer by Bill
15 Hilty at 1:50, and that's just the, I think, the
16 consent.
17 A  There was an -- I think Bill Stout had
18 received confirmation of acceptance of transfer at
19 0150, and then the patient physically left -- I'm
20 not sure from looking at Cindy's note here. I'm
21 looking at page AVH 57.
22 Q  Okay.
23 A  I'm not sure looking at this what the
24 time is the patient actually left the building.
25 Q  Okay. Right. Cindy's note says 3:45.

279

1  And I apologize. I said Bill Hilty. I meant Bill
2  Stout.
3      MR. WOLANSKE: Cindy's note says 3:45
4  or 4:53.
5      MS. THOMAS: We'll ask Cindy.
6  Q  (By Ms. Thomas) If the helicopter
7  documentation states that they departed the scene
8  here at 3:57, you'd have no reason to disagree with
9  that; is that fair?
10 A  I'm not sure what you're referring to.
11 Q  The transport medical record from here
12 to St. Mary's.
13 A  Do I have that form?
14 Q  I don't know if you do. I'm just
15 representing to you that that document indicates
16 that -- and I'm happy to show it to you -- that
17 they departed the scene at 3:57 mountain time.
18 A  If they said they departed, then I
19 don't think I have any reason to -- I don't recall
20 any reason to think otherwise.
21 Q  Okay. And we just talked about Bill
22 Stout had signed off on the transfer documentation
23 of the transfer around 1:50 in the morning. So
24 certainly, there was a several-hour delay in
25 transferring Tamar over to St. Mary's, true?

280

1      MR. WOLANSKE: Form.
2      MR. NOWAK: Object to the form.
3  A  Can you say again how much time?
4  Q  (By Ms. Thomas) Well, I think we just
5  looked at Bill Stout's transfer. Yeah. I'll show
6  it to you. It's Patient Transfer Certification.
7  That's documented at 1:50 in the morning?
8  A  Correct.
9  Q  And I'll represent to you that she was
10 signed over to St. Mary's at 5:05 in the morning.
11 So that's a delay, in terms of neurosurgical
12 evaluation, between at least 1:50 a.m. and
13 somewhere after 5:05 a.m., true?
14     MR. LAKE: Object to form.
15 A  It's a difference of three hours.
16 Q  (By Ms. Thomas) Sure. And you agree,
17 Doctor, that -- well, that was the time the patient
18 transfer was signed, at 1:50. There was certainly
19 signs and symptoms of deterioration prior to 1:50
20 in the morning for this patient, true?
21     MR. WOLANSKE: Form.
22 A  There were signs and symptoms of a
23 change in condition which prompted us to do a CT
24 scan, which was prior to transfer.
25 Q  (By Ms. Thomas) Sure. And what

281

1 prompted you was that she appeared to be
2 deteriorating, true?
3    A    What prompted was her condition at --
4 I'd have to refer to exactly what time it was.
5    Q    But it was a deterioration, was it
6 not, Doctor?
7    A    Yes.
8    Q    And had she been in a hospital with a
9 neurosurgeon at the time she deteriorated, would
10 you -- strike that.
11         I'll represent to you Dr. Lopez told
12 me, if she was in St. Mary's earlier in the evening
13 than the time she was transferred, he more likely
14 than not would have performed surgery earlier than
15 he did. Do you have any reason to disagree with
16 Dr. Lopez?
17   A    I'm sorry. Say -- he's saying that --
18   Q    Sure. We went through the Aspen
19 records when I took his deposition, and we
20 discussed her deterioration while she was in the
21 ICU. He told me, when I took his deposition, had
22 she been in his hospital at the time she
23 deteriorated, he would have taken her to surgery
24 earlier. Are you with me so far?
25   A    I'm not sure exactly what time he's

282

1 referring to, but . . .
2    Q    And you would defer to him as to when
3 it would be appropriate to take her to surgery,
4 true?
5    A    If she was under his care, yes, I
6 would defer to him when he would take her to
7 surgery.
8    Q    Sure. And if she's not under his
9 care, because she's not in his hospital, because
10 you didn't transfer her, he can't perform surgery
11 earlier than he did, true?
12        MR. WOLANSKE: Object to form,
13 argumentative.
14   A    I don't know.
15   Q    (By Ms. Thomas) Well, he can't perform
16 surgery here at Aspen Valley, true?
17   A    But I don't know if he could have
18 performed surgery earlier than he did.
19   Q    Okay. Well --
20   A    I don't know what he's doing there. I
21 don't know if he's got another case going. I don't
22 know -- I don't know what he's doing. I can't
23 confirm or deny that he would have been able to
24 perform surgery earlier.
25   Q    Okay. And he'd be the best person to

283

1 tell us whether he could have performed surgery
2 earlier, true, assuming she was in his hospital
3 earlier than 5:05 in the morning?
4    A    Yes.
5    Q    Did you agree with the CT report from
6 the second CT which was signed by Dr. Lampert?
7         MR. WOLANSKE: Form.
8    A    Agree with it at what point?
9    Q    (By Ms. Thomas) Did you agree with his
10 impression?
11   A    Since the time of her transfer, I have
12 read that report. I would have to refer to it
13 again. I have not reviewed the CT scan since the
14 time of my care with Ms. Kellner, and it was not
15 available at the time of her care.
16   Q    I'll just hand you the report, to make
17 it easier. Tell me if you have any disagreements
18 since you looked at that film as well.
19   A    I said I have not looked at the film.
20   Q    I'm sorry. But you looked at the film
21 at the time?
22   A    I would have to -- I would have to
23 look at the film and compare it with this report in
24 order to say whether I agree or disagree.
25   Q    But as you sit here today, you don't

284

1 recall having any disagreements with Dr. Lampert at
2 that time; is that fair?
3    A    No, I don't think it's fair. I don't
4 think I can say that.
5    Q    When is the last time you looked at
6 the CT, the second one?
7    A    At approximately 1:47 that morning.
8    Q    Okay. And do you know when you
9 reviewed Dr. Lampert's report?
10   A    Probably upon my review of the chart
11 in preparation for today.
12   Q    Am I correct you've never called
13 Dr. Lampert and told him you disagree with his
14 interpretation of the second CT scan?
15   A    I have not called Dr. Lampert about
16 this report.
17   Q    Would you mind passing it back to me.
18 And you dictated your discharge summary, it looks
19 like, on the 21st about 5:00 in the morning; is
20 that fair?
21   A    What page is that?
22   Q    I'm sorry. It's page 11 and 12.
23   A    It looks like it was dictated at 0503.
24   Q    Okay. And this is your dictation,
25 true?