IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 11-cv-00688-MSK-MJW

TAMAR KELLNER,

        Plaintiff,

v.

JOHN F. SCHULTZ, M.D.;
JOHN A. LOPEZ, M.D.; and
ASPEN VALLEY HOSPITAL DISTRICT d/b/a Aspen Valley Hospital,

        Defendants.

---

OPINION AND ORDER DENYING DEFENDANT LOPEZ'S
MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART AND
DENYING IN PART DEFENDANT ASPEN VALLEY HOSPITAL'S
MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court on two motions for summary judgment.  The first is Defendant John A. Lopez, M.D,'s Motion for Summary Judgment (**#60**), to which the Plaintiff Tamar Kellner Responded (**#68**), and Dr. Lopez Replied (**#73**).  The second is Defendant Aspen Valley Hospital's Motion for Summary Judgment on Duty and Causation (**#61**), to which Ms. Kellner Responded (**#66**), and Aspen Valley Hospital Replied (**#72**).

## I.  Jurisdiction

The Court exercises jurisdiction under 28 U.S.C. § 1332.  It appears that the parties agree their dispute is governed by Colorado law.

## II.  Material Facts

Having reviewed the motions and evidence submitted in support thereof, and construing the evidence in the light most favorable to the non-movant, it appears that the following are the material facts.

1

The Plaintiff, Ms. Kellner, fell while skiing in Snowmass, Colorado.  She suffered a head injury and was taken to Aspen Valley Hospital (AVH, or the Hospital) Emergency Department for treatment.  At the time, AVH was a Level III trauma center without an active neurosurgeon.

At AVH, Ms. Kellner's treating physician was Defendant John F. Schultz, M.D.  During his evaluation, Dr. Schultz became aware that Ms. Kellner was prescribed Coumadin, a blood thinner.  He ordered that a scan of her brain, which showed an intracranial hemorrhage.  After Dr. Schultz reviewed Ms. Kellner's scan images, he sent them electronically to St. Mary's Hospital in Grand Junction, Colorado.  Dr. Schultz then called St. Mary's and spoke with Defendant John A. Lopez, M.D., the neurosurgeon on-call.  During the call, the doctors discussed Ms. Kellner's medical history and condition and the possibility of transferring her to St. Mary's.  Dr. Lopez indicated that Ms. Kellner did not require an emergent neurosurgical procedure, but that he would accept her transfer if Dr. Schultz decided to take that course of action.  Dr. Schultz did not transfer Ms. Kellner, but instead admitted her to the AVH Intensive Care Unit for the night.

Ms. Kellner's condition deteriorated overnight.  Mary Frances Powell, R.N. observed Ms. Kellner at 6:40 P.M., and again at 7:06 P.M.  At those times, Ms. Kellner had a headache, was nauseous and vomiting.  When the nursing shift changed, Cindy Doss, R.N. became Ms. Kellner's nurse.  Ms. Kellner experienced an increased headache and continuing nausea and vomiting.  At 11:20 P.M. Nurse Doss observed that Ms. Kellner was not oriented and she could not make out words.  At 11:40 P.M. Nurse Doss contacted her nursing supervisor about Ms. Kellner's condition, but no new orders were received.  Nurse Doss continued to closely monitor Ms. Kellner, and at 1:06 A.M. she contacted Dr. Schultz.

At about 1:25 A.M., Dr. Schultz ordered a second brain scan, which showed the development of a large subdural hemorrhage.  At approximately 1:50 A.M., he ordered that she be transferred to St. Mary's.  Dr. Lopez admitted Ms. Kellner to St. Mary's and performed neurosurgery to remove the hemorrhage.

Since her discharge from St. Mary's, Ms. Kellner asserts that she continues to suffer permanent brain dysfunction.  Ms. Kellner asserts claims of medical negligence against Dr. Lopez and the Hospital.  As to Dr. Lopez, she alleges that he was negligent when he consulted with Dr. Schultz by failing to recognize the urgent nature of her condition, failing to order that she be transferred to St. Mary's, and failing to ensure that certain treatments were ordered.[1]  As to the Hospital, Ms. Kellner asserts that it hospital employees, including Nurses Powell and Doss, were negligent in failing to transfer her to a hospital with neurosurgical capabilities, failing to perform appropriate nursing assessments, failing to appreciate and communicate the urgent nature of her condition, failing to order a brain scan promptly, failing to follow applicable policies and procedures, failing to activate the chain of command, and failing to advise her that AVH did not have neurosurgical capabilities.

Dr. Lopez and the Hospital both move for summary judgment on the claims against them.

### III. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that

---

[1] Ms. Kellner does not allege that Dr. Lopez acted negligently after she was transferred and admitted to St. Mary's.

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

    If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and enters

judgment.

    If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

claim or defense, a trial is required.  If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## V. Analysis

### A.  Motion by Defendant Dr. John A. Lopez, M.D.

Dr. Lopez contends that Ms. Kellner cannot establish that he owed her a legal duty of care, other than the duty to accept her transfer.  Ms. Kellner has the burden of establishing a duty.  However, the challenge raises distinct legal and factual issues. The Court construes the evidence most favorably to Ms. Kellner.

There are two parts to Dr. Lopez's argument.  First, he argues that any duty he owed to Ms. Kellner is defined by two agreements[2] that are in place between AVH and St. Mary's — the Network Agreement and the Agreement for Patient Transfer.  He asserts that he fulfilled his duty under the contacts by offering to accept Ms. Kellner's transfer.  Next, he argues that he did not owe Ms. Kellner any duty beyond what was specified by the contracts.  Dr. Lopez contends that he did not have a physician-patient relationship with her because he did not undertake to treat her, and therefore, he owed her no duty of care with regard to her treatment.

Ms. Kellner responds that the contracts Dr. Lopez refers to do not dictate whether he owed her a duty of care.  She further argues that when Dr. Lopez evaluated her images and consulted with Dr. Schultz, he was undertaking treatment, and therefore he had a physician-patient relationship with her.  Even absent a physician-patient relationship, Ms. Kellner argues that the Court should recognize a duty in this case.

Under Colorado law, medical malpractice is a type of negligence action.  *Greenberg v. Perkins*, 845 P.2d 530, 534 (Colo. 1993).  In negligence actions, the plaintiff has the burden of proving that a defendant had a legal duty of care, that the defendant breached that duty, there was

---

[2] There appears to be no factual dispute as to the existence of the agreements.

injury to the plaintiff, and that the defendant's breach caused the plaintiff's injury. *Id.* at 533. A negligence claim will fail if it is predicated on circumstances for which the law imposes no duty on the defendant. *HealthONE v. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002). Thus, the initial question in any negligence action is whether the defendant owed a legal duty to protect the plaintiff against injury. *Id.* The question of whether the defendant owes a plaintiff a duty to act to avoid injury is a question of law to be determined by the court. *Id.*

In a medical malpractice action, the duty owed typically arises out of the professional relationship between physician and patient. *Greenberg*, 845 P.2d at 534. When a physician undertakes to treat or otherwise provide medical care to another, the physician contracts to exercise reasonable and ordinary care and diligence to fulfill that purpose. The contract may be express, such as where the relationship is defined by "special contracts" between physician and patient, or it may be implied, as in the case where the relationship arises simply because the physician provided care. *Id.*

In the absence of a physician-patient relationship, however, a duty of reasonable care may arise when there is foreseeable risk that a plaintiff will be injured by a defendant's failure to take protective action. *HealthONE*, 50 P.3d at 888. In such cases, a court must consider many factors in determining whether a duty should be recognized, including: (1) the risk involved, (2) the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, (3) the magnitude of the burden guarding against injury or harm, and (4) the consequences of placing the burden upon the actor. *Id.* (citing *Greenberg*, 845 P.2d at 536). These factors are not exhaustive, and a court may consider any other relevant factor based on the "competing individual and social interests implicated by the facts of the case." *Id.* Because no single factor controls, "the question of whether a duty should be imposed in a particular case is

essentially one of fairness under contemporary standards — whether reasonable persons would recognize a duty and agree that it exists." *Id.*

The Court understands the first part of Dr. Lopez's argument to be that his relationship with Ms. Kellner was governed by the Network Agreement and the Agreement for Patient Transfer.  Having reviewed the agreements, however, the Court does not find them to be determinative.  The agreements are between AVH and St. Mary's, and they outline the policies and procedures to be followed when a patient is eligible for transfer between AVH and St. Mary's, but they do not address when or whether a physician-patient relationship exists between a doctor a St. Mary's and a patient at AVH.  Consequently, although Dr. Lopez may have a duty to act in accordance with the agreements, the agreements themselves do not establish or define his relationship with Ms. Kellner.

Next, Dr. Lopez asserts that he did not undertake to treat Ms. Kellner, and thus, he did not have an implied physician-patient relationship with her.  Dr. Lopez admits that he reviewed Ms. Kellner's brain scan and was informed of her condition and medical history before opining to Dr. Schultz that she did not need an emergent neurosurgical procedure.  But, it is also undisputed that Dr. Lopez was not a doctor at AVH and, before Ms. Kellner was transferred, he did not personally examine her, never spoke directly with her or her family, nor prescribed any treatment.  Further, there is no evidence to show that Ms. Kellner was aware that Dr. Schultz consulted with Dr. Lopez, or that she consented to Dr. Lopez treating her.

Based on the undisputed facts, it appears that Dr. Lopez provided consulting services to Dr. Shultz.  Colorado courts have not addressed whether a physician-patient relationship arises between a patient and a consulting physician.  Courts in other jurisdictions have found that, in circumstances similar to those presented here, no physician-patient relationship arises between a

patient and a consulting physician.   *See, e.g., Hill by Burston v.* Kokosky, 463 N.W.2d 265, 266 (Mich. App. 1990); *St. John v. Pope*, 901 S.W.2d 420, 424 (Tex. 1995); *Corbet v. McKinney*, 980 S.W.2d 166, 170 (Mo. App. 1998); *Irvin v. Smith*, 31 P.3d 112, 120 (Kan. 2001).

The evidence of record does not show that Dr. Lopez provided care to Ms. Kellner, only that he provided advice to Dr. Schultz.  Dr. Lopez expressly left the decision as to whether to transfer Ms. Kellner to St. Mary's to Dr. Schultz.  Because there is no evidence that Dr. Lopez provided care to Ms. Kellner, the Court cannot find an implied physician-patient relationship between Ms. Kellner and Dr. Lopez.

Having concluded that neither an express nor an implied physician-patient relationship existed between Dr. Lopez and Ms. Kellner, the next question is whether there is a common-law duty that arises outside of the physician-patient relationship.  This is a mixed question of fact and law subject to a multi-factor test.  As noted earlier, the factors include: (1) the risk involved, (2) the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, (3) the magnitude of the burden guarding against injury or harm, and (4) the consequences of placing the burden upon the actor.  *Greenberg*, 845 P.2d at 536.

By its nature, this test requires a factual assessment on a case-by-case basis.  In such circumstances, the Court's role is to determine whether there is a dispute as to material fact that requires a trial.  There clearly are factual issues that must be determined.  What was the risk associated with Dr. Lopez's assessment of the brain scans and the rendering of his opinion that no immediate transfer was required?  Was Ms. Kellner's surgical outcome affected by delay in transfer?  Was such outcome foreseeable?  How does foreseeability weigh against the social utility of having physicians with specialized expertise provide consultation to physicians without such expertise (especially where there is a substantial geographic distance between physicians)?

These factual issues are intertwined with other issues in the case — notably, the effect of delay in transfer upon successful treatment of Ms. Kellner.

At this juncture, the Court declines to assess the conflicting evidence submitted, leaving it for presentation at trial. Whether it is the Court or a jury who makes the determination as to the existence of a duty of care outside the physician-patient relationship has not been fully addressed by the parties, but the Court invites the parties to address the issue prior to trial.

The Court concludes that Dr. Lopez had neither a contractual duty nor a duty arising out of a physician-patient relationship to Ms. Kellner. However, there are material facts in dispute that bear upon whether a common-law duty of care should be recognized outside the physician-patient relationship under the particular circumstances of this case. Thus, the Motion is DENIED.

### B. Motion of Defendant Aspen Valley Medical Hospital

The Hospital seeks summary judgment in its favor based on two arguments, the first of which requires an interpretation of the law rather than a determination of whether there are facts in dispute. The second challenges Ms. Kellner's ability to present a *prima facie* case which requiring resolution at trial. In both circumstances, the Court views the evidence most favorably to Ms. Kellner.

First, the Hospital contends that under Colorado's "corporate practice of medicine doctrine," it is shielded from liability for negligent decisions made by its physician employees. [3] For this reason, it argues that it cannot be held responsible for Dr. Schultz's initial decision to admit Ms. Kellner to AVH rather than to transfer her to St. Mary's. Second, as to Ms. Kellner's allegations of negligent nursing care during her stay at AVH, the Hospital contends that Ms.

---

[3] This argument appears to be in the nature of an affirmative defense — akin to immunity or a bar of certain claims. As such, it is the Hospital's burden of proof to establish it. The material facts appear undisputed. The Hospital employed Dr. Schultz, a licensed physician.

Kellner cannot establish that the nurse's negligence and resulting delay in transfer to St. Mary's caused her injuries.

    *1.  Decision to Transfer*

      In Colorado, the corporate practice of medicine doctrine is a common law principle that recognizes that it is impossible for an entity to perform medical actions or be licensed to practice medicine. *Estate of Harper ex rel. Al-Hamim v. Denver Health and Hosp. Authority*, 140 P.3d 273, 275 (Colo. App. 2006); *see* C.R.S. § 12-36-134. Under this doctrine, a corporation that employs a physician may not interfere with the physician's independent medical judgment, and accordingly a corporate entity cannot be held vicariously liable for the negligent acts of their physician employees. However, the corporate practice of medicine doctrine does not extend to non-physician hospital employees, such as nurses. *See Nieto v. State*, 952 P.2d 834, 840-41 (Colo. App. 1997), *aff'd in part, rev'd in part on other grounds*, 993 P.2d 493 (Colo. 2000).

      Ms. Kellner admits that the corporate practice of medicine doctrine shields the Hospital from liability for the negligence of its physicians. She argues, however, that the decision to transfer a patient is not a medical decision made solely by physicians. Thus, she contends that under the circumstances the Hospital had a duty to ensure that she be transferred to St. Mary's.

      For support, Ms. Kellner relies on the Agreement for Patient Transfer and the Network Agreement that were in place between AVH and St. Mary's. She points out that Agreement for Patient Transfer states that the "*Facility*, [St. Mary's], agrees to admit a patient from [AVH] . . . ." She also points to the "Patient Referral and Transfers" section of the Network Agreement, which states that "[AVH] will identify for transfer patients that require services not offered by [AVH]. Such patients will be transferred to a facility that can provide the needed service. St. Mary's Hospital agrees to accept all appropriate patients referred by [AVH] . . . ." Relying on

that language, Ms. Kellner argues that it is the Hospital rather than a physician that identifies and agrees to transfer a patient.

Viewing the relevant evidence[4] in the light most favorable to Ms. Kellner, the Court concludes that the corporate practice of medicine doctrine shields the Hospital from claims arising from Dr. Shultz' determination to admit Ms. Kellner rather than to transfer her to St. Mary's.  The Agreement for Patient Transfer makes clear that a patient's need for transfer is "determined by the patient's physician" and that the "attending physician" must determine whether the patient, at the time of transfer, is in an "emergency medical condition."  Further, the Network Agreement goes on to state that "[t]he transfer or referral protocol shall be initiated and followed by the patient's attending physician or the emergency room physician on duty, as the case may be, in determining whether a transfer should be made."  Although the Agreements reflect that there are many individuals involved in the logistical aspects of effectuating a patient transfer, the decision to transfer or to not transfer is a medical decision made by the treating physician.  Because the Hospital cannot override a professional medical decision made by a licensed physician, it cannot be held vicariously liable for the physician's decision.

Accordingly, entry of summary judgment in favor of the Hospital is appropriate as to any claim based on Dr. Schultz decisions.

*2.  Nursing Care*

The Hospital characterizes the remainder of Ms. Kellner's allegations as an assertion that its employees were negligent in failing to advocate for, and facilitate, a transfer soon than when

---

[4] The Court disregards the testimony of expert witnesses proffered by the Defendant as irrelevant to the issue because: 1) the argument made by Ms. Kellner is based upon written contracts, the interpretation of which is a legal issue; and 2) it is undisputed that in this case, the decision to admit Ms. Kellner to AVH rather than to immediately transfer her to St. Mary's was made by Dr. Schultz.

Dr. Schultz ordered it.  The Hospital admits that there is sufficient evidence to create a genuine issue of fact as to whether the standard of care owed to Ms. Kellner by Hospital employees was breached.  The Hospital argues, however, that even if the standard of care was breached, Ms. Kellner cannot establish that the delay attributable to it negligence actually contributed to Ms. Kellner's injuries.

This is a classic motion for summary judgment in which the Defendant Hospital challenges Ms. Kellner's ability to demonstrate that negligent conduct (if any) by nurses caused her injuries.  Ms. Kellner bears the burden of proof to establish causation.

The crux of this issue is whether a delay in transfer of Ms. Kellner from AVH to St. Mary's affected her surgical outcome.  The parties have argued about how long the delay in transfer was and whether it had any effect.   Ms. Kellner has come forward with evidence that tends to show that *any* delay in treating Ms. Kellner's injury contributed to her subsequent neurological impairment.  Dr. James Lowe opined that early, prompt surgery is associated with better outcomes in cases of subdural brain hemorrhages.  He further opined that had Ms. Kellner undergone surgery earlier, her outcome would have been better.  Dr. Robert E. Breeze also testified that for brain injuries requiring surgery, the surgery should be done in a "timely fashion" to improve the chance that the injury will not compromise cerebral blood flow.  Dr. Breeze opined that, had Ms. Kellner been operated on the night before, she would have had a high probability of "good recovery."  This evidence is sufficient[5] to create a genuine issue of fact as to causation, and accordingly the Hospital's motion is DENIED as to claims based on nurse negligence.

_____

[5] In its briefing, the Hospital requests a "Daubert" hearing with regard to expert opinions offered by Ms. Kellner.  The Court disregards the request in determination of the subject motions.  The request was not made by separate motion, does not comply with MSK Civ. Practice Standard IV.G, and neither identifies the opinions to be challenged under F.R.E. Rule 702 nor the basis for the challenge.

**V.  Conclusion**

For the forgoing reasons, Defendant John A. Lopez, M.D,'s Motion for Summary

Judgment **(#60)** is **DENIED**.  Defendant Aspen Valley Hospital's Motion for Summary

Judgment **(#61)** is **GRANTED IN PART** and **DENIED IN PART**.  The motion is granted with

regard to claims based on Dr. Schultz's decisions.  The motion is denied with regard to the claim

that nurses at the Hospital provided negligent care.

The parties shall begin preparation of a Proposed Pretrial Order pursuant to the

previously-issued Trial Preparation Order **(#23)** and shall jointly contact chambers to promptly

schedule a Pretrial Conference.

Dated this 28th day of March, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge